**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RAJKUMAR RAJAPPAN, individually and as a representative of a class of similarly situated persons, and on behalf of the BLOOMBERG L.P. 401(K) PLAN,<br><br>PLAINTIFFS,<br><br>v.<br><br>BLOOMBERG L.P., THE INVESTMENT COMMITTEE and its members, THE RETIREMENT PLAN COMMITTEE and its members, and JOHN DOES 1–30,<br><br>DEFENDANTS. | **Case No. 26-CV-00785**<br><br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF'S ORIGINAL COMPLAINT**

## I.    INTRODUCTION

1.    This case arises from breaches of fiduciary duty under the Employee Retirement Income Security Act ("ERISA") by the fiduciaries of the Bloomberg L.P. 401(k) Plan (the "Plan").

2.    Bloomberg L.P. ("Bloomberg"), the Bloomberg Investment Committee and its members (the "Investment Committee"), the Bloomberg Retirement Plan Committee and its members (the "Retirement Plan Committee"), and John Does 1–30 (collectively, "Defendants," "Bloomberg," or "Bloomberg Defendants") are the fiduciaries of the Plan who breached their duty.

3.    As fiduciaries, the Bloomberg Defendants have an obligation to select prudent investment options for the Plan so that its participants can build savings to sustain them during their so-called golden years of retirement. The Plan's participants, who are typically current or

former Bloomberg employees, may earmark their retirement plan contributions only for the investment options that the Bloomberg Defendants select for the Plan.

4.    The Bloomberg Defendants also must continually monitor and reassess each individual investment option on its own merits and remove ones that no longer meet their investment objectives.

5.    The Bloomberg Defendants have kept two serially underperforming funds—the Harbor Capital Appreciation Fund (the "Harbor Fund")[1] and the Parnassus Core Equity Fund (the "Parnassus Fund")[2]—in the Plan for over 10 years.

6.    The Defendants' decision not to remove either the Harbor Fund or the Parnassus Fund (the "Funds," or the "Challenged Funds") breached their fiduciary responsibilities to act with a singular focus on the needs of the Plan's participants and beneficiaries. The Bloomberg Defendants seemingly ignored clear warning signals, keeping the Challenged Funds in the Plan

---

[1] The Harbor Fund has undergone multiple reorganizations. It was first organized as a mutual fund. In 2021, its assets were transferred to a newly formed entity called the Harbor Capital Appreciation Collective Investment Trust Class 4. In and around 2023, those assets once again were transferred to a portfolio called the Harbor Capital Appreciation Collective Investment Trust Class R. The investment teams, aims, risks, and potential rewards of each are identical, and the portfolio holdings are substantially identical. From the perspective of the Plan, the conversion from the mutual fund to the collective investment trust reflected a continuation of the same investment option. Although separate legal entities, the Harbor Capital Appreciation Collective Investment Trust Class 4 and Class R are clones of the Harbor Fund and of each other. Accordingly, throughout this complaint, Plaintiff uses the term "Harbor Fund" to refer collectively to the mutual fund and collective investment trusts.

[2] The Parnassus Fund also has undergone a reorganization while in the Plan. In 2022, its assets were transferred to an entity called the Parnassus Sustainable Core Equity Collective Investment Trust Class 1. The investment teams, aims, risks, and potential rewards of each are identical, and the portfolio holdings are substantially identical. From the perspective of the Plan, the conversion from the mutual fund to the collective investment trust reflected a continuation of the same investment option. Although separate legal entities, the Parnassus Sustainable Core Equity Collective Investment Trust Class 1 is a clone of the Parnassus Fund. Accordingly, throughout this complaint, Plaintiff uses the term "Parnassus Fund" to refer collectively to the mutual fund and collective investment trust.

despite years of underperformance that tanked the retirement savings of thousands of Plan participants.

## II.    OVERVIEW OF CLAIMS

7.    Plaintiff Rajkumar Rajappan brings this action under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), on behalf of the Plan and the Plan's participants and beneficiaries against the Bloomberg Defendants for breach of fiduciary duties under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001–1461.

8.    By 2010, the Bloomberg Defendants had selected the Harbor Fund as an investment option for the Plan. The Harbor Fund invests primarily in the largest companies in the United States. It is identified as a large cap growth fund.

9.    By 2015, the Bloomberg Defendants had selected the Parnassus Fund as an investment option for the Plan. The Parnassus Fund also invests in the largest companies in the United States. It is identified as a large cap core fund.

10.    As of December 31, 2024, Plan participants had invested over $437 million of their retirement savings in the Harbor Fund and over $59 million in the Parnassus Fund.

11.    Investors commonly assess the quality of a fund based on its preceding 1-year, 3-year, and 5-year investment performance.

12.    As outlined in Section VIII, Tables 1.a. – 1.b. and 2.a. – 2.b., the Challenged Funds' investment performance failed to outperform their stated benchmarks, the Russell 1000 Growth

Index (the "Russell")[3] for the Harbor Fund and the S&P 500 Index (the "S&P")[4] for the Parnassus Fund. The Challenged Funds also underperformed some of the more highly reputable investment funds that similarly invest in the largest companies in the United States, e.g., Fidelity, Vanguard, J.P. Morgan (the "Comparator Funds").

13.    In the ten-year period ending December 31, 2019, the Harbor Fund struggled against the Russell, underperforming it by over 23 percentage points (312% v. 289%), and on average by 67 basis points annually.

14.    From the time it was added to the Plan in 2015, through December 31, 2019, the Parnassus Fund struggled against the S&P, underperforming it by over 5 percentage points (74% v. 69%), and on average by 67 basis points annually.

15.    By 2020, the Harbor Fund had underperformed the Russell over the 1-year, 5-year, and 10-year marks. Likewise, the Parnassus Fund underperformed the S&P over each of the 1-year, 3-year, 5-year, and 10-year marks.

16.    Relative to the Comparator Funds in Tables 1.a. – 1.b. and 2.a. – 2.b., the Challenged Funds' underperformance was even worse.

---

[3] The Russell 1000 Growth Index is independently maintained by FTSE Russell, a wholly-owned subsidiary of the London Stock Exchange Group. FTSE Russell is a leading global provider of benchmarking, analytics, and data solutions for investors with over 30 years in the business. The Russell 1000 Growth Index measures the performance of the large-cap growth segment of the U.S. stock market. It includes those Russell 1000 companies with relatively higher price-to-book ratios, higher forecast medium-term growth, and higher sales-per-share historical growth (i.e., growth companies).

[4] The Standard and Poor's 500 Index, or simply the S&P 500 Index, is independently maintained by S&P Dow Jones Indices LLC, a global analytics company and division of S&P Global. S&P Global Ratings is the largest global provider of financial market indices which serve as benchmarks for investors worldwide. The S&P 500 Index measures the performance of the large-cap segment of the U.S. stock market. It includes five-hundred leading U.S. companies and covers about 80% of the available U.S. market capitalization.

17.    As shown in Tables 1.c and 2.c, the Challenged Funds' underperformance against their respective benchmarks and Comparator Funds continued, predictably, to deteriorate after 2019. Since January 1, 2020, the Harbor Fund's cumulative performance has fallen over 24 percentage points (182% v. 158%) below the Russell.

18.    The Parnassus Fund's cumulative performance dropped nearly 20 percentage points (132% v. 112%) below the S&P.

19.    As of December 31, 2025, the Harbor Capital Fund has underperformed the Russell benchmark over each of the past 5-year, 10-year, 15-year, 20-year, and 25-year periods.

20.    At the same time the Parnassus Fund has underperformed the S&P over each of the past 5-year, 10-year, and 15-year periods.

21.    During the same period, the Challenged Funds' respective underperformance was even worse relative to the investment performance of the Comparator Funds.

22.    Faced with this type of persistent, long-term poor performance, the Defendants should have removed the Challenged Fund from the Plan. Instead, the Defendants kept them in the Plan and impaired the retirement savings of those who held an interest in these Funds.

23.    Defendants' failure to remove the Challenged Funds has been disastrous for Plan participants. As described in Section VIII, Table 1.c., the Challenged Funds have cost the Plan and its participants between approximately $79,900,000 and $197,800,000 in retirement savings.

24.    To remedy Bloomberg's breach of fiduciary duty, Plaintiffs bring this action on behalf of the Plan, its participants, and their beneficiaries under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), to enforce the Bloomberg Defendants' personal liability under ERISA § 409(a), 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from each breach of fiduciary duty

occurring during the Class Period. In addition, Plaintiffs seek such other Plan-wide equitable or remedial relief for the Plan as the Court may deem appropriate.

25.     Plaintiffs did not have knowledge of all material facts (including, among other things, comparisons of the Plan's investment performance relative to other available investment alternatives) necessary to understand that the Bloomberg Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before filing this Complaint. Further, Plaintiffs do not have actual knowledge of the specifics of the Bloomberg Defendants' decision-making processes with respect to the Plan, including the Bloomberg Defendants' processes for monitoring and removing Plan investments, because this information is solely within the possession of the Bloomberg Defendants prior to discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

### III.     PARTIES

**A.     Plaintiffs**

26.     Plaintiff Rajkumar Rajappan brings this suit in a representative capacity on behalf of the Plan and its participants and beneficiaries pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), seeking appropriate relief under ERISA § 409, 29 U.S.C § 1109, to protect the interests of the Plan. Plaintiff Rajkumar Rajappan was a participant in the Plan, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), during the Class Period. Plaintiff Rajkumar Rajappan suffered individual injury by investing in one or both of the Challenged Funds.

**B.     Defendants**

27.     Defendant Bloomberg is headquartered in New York, New York, and is a major financial, media, software, and analytics company. Bloomberg is the Plan sponsor.

28.     Defendant the Bloomberg Investment Committee chooses the investment options for the Plan and periodically monitors and reviews the Plan's investment options. It may revise the Plan's investment line-up at any time. Current and former members of the Investment Committee are or were fiduciaries of the Plan under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because they have exercised discretionary authority and/or discretionary control respecting management of the Plan.

29.     Defendant Bloomberg Retirement Plan Committee manages the operation and administration of the Plan. Current and former members of the Retirement Plan Committee are or were fiduciaries of the Plan under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because they have exercised discretionary authority and/or discretionary control respecting management of the Plan.

30.     Plaintiffs are currently unaware of the identities of the individual members of the Investment Committee and the Retirement Plan Committee during the Class Period. Accordingly, those individuals are collectively named Defendants John Does 1–30 (the "Doe Defendants"). Plaintiffs will substitute the real names of the Doe Defendants when they become known to Plaintiffs. To the extent the Defendants delegated any of their fiduciary functions to another person or entity, the nature and extent of which has not been disclosed to Plaintiffs, the person or entity to which the function was delegated is also a fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) and thus alleged to be a Doe Defendant.

## IV.     JURISDICTION, VENUE, AND STANDING

31.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2).

32.     This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the District in which the subject Plan is administered and where

at least one of the alleged breaches took place. It is also the District in which the Bloomberg Defendants reside.

33.     As a participant in the Plan and holder of the Harbor Fund, Plaintiff has standing to bring claims on behalf of the Plan pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and is a participant seeking appropriate Plan-wide relief under ERISA § 409, 29 U.S.C. § 1109. Thus, Plaintiff brings this suit under 29 U.S.C. § 1132(a)(2) in a representative capacity on behalf of the Plan as a whole and seek remedies under ERISA § 409, 29 U.S.C. § 1109 to protect the Plan.

## V.     ERISA'S FIDUCIARY STANDARDS

### A.     Overview of ERISA's Fiduciary Duty of Prudence

34.     ERISA's fiduciary duties are "the highest known to the law." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016) (en banc) (internal quotation marks omitted). ERISA's duty of prudence requires fiduciaries to discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters would use." ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B). Accordingly, even in a defined contribution plan in which participants choose their investments, plan fiduciaries must conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options. *Hughes v. Nw. Univ.*, 595 U.S. 170, 176 (2022).

35.     As part of its fiduciary duty, Bloomberg "has a continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). That "continuing duty" exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Id.* "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* at 530. If an

investment is imprudent, Bloomberg "must dispose of it within a reasonable time." *Id.* (citation omitted).

## B.     Fiduciary Liability Under ERISA

36.     Under ERISA § 409, 29 U.S.C. § 1109, fiduciaries to the Plan are personally liable to make good to the Plan any harm caused by their breaches of fiduciary duty. ERISA § 409(a), 29 U.S.C. § 1109(a), provides in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to *such plan* any losses to the plan resulting from each such breach, and to restore to *such plan* any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

37.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), is the enforcement mechanism of ERISA § 409, 29 U.S.C. § 1109. It enables participants and beneficiaries to bring civil actions to seek appropriate relief under ERISA § 409, 29 U.S.C. § 1109.

## C.     Co-Fiduciary Liability Under ERISA

38.     ERISA provides for co-fiduciary liability where a fiduciary knowingly participates in, or knowingly fails to cure, a breach by another fiduciary. Specifically, under ERISA § 405(a), 29 U.S.C. § 1105(a), a fiduciary shall be liable for a breach of fiduciary duty by a co-fiduciary:

> i.     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
> ii.    if by his failure to comply with [29 U.S.C. § 1104(a)(1)] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> iii.   if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

9

## VI.    THE PLAN

39.    The Bloomberg L.P. 401(k) Plan is a profit-sharing plan as described in Section 401(k) of the Internal Revenue Code, I.R.C. § 401(k) (1986) (hereinafter denoted as "the Code") and is subject to the provisions of ERISA. The plan is established and maintained under a written document in accordance with ERISA § 402(a), 29 U.S.C. § 1102(a). Bloomberg is the sponsor of the Plan.

40.    During the Class Period (as defined below in ¶158), the Plan provided for retirement income for approximately 20,000 Bloomberg employees, former employees, and their beneficiaries (the "Plan participants"). Defendants exclusively controlled the selection and retention of the Plan's investment options. Participants' retirement account balances primarily depended on contributions they made to their accounts, Bloomberg's matching contributions, and the performance (net of fees and expenses) of the Plan's investment options.

41.    As of December 31, 2024, Plan participants had invested over $5.7 billion in the Plan. Over $497 million in the Plan—or about 9%—was invested in the Challenged Funds.

## VII.    OVERVIEW OF INVESTMENT FUNDS

42.    An investment fund is a pool of money contributed by a group of investors with similar investment objectives. The investment adviser takes this pool of money and invests in different stocks on behalf of all investors in the fund. The investment adviser manages the investments in each fund in accordance with the investment objectives and strategies set forth in each fund's investment guidelines. For providing this service, the investment adviser charges the fund an investment advisory fee.

**A.     Active vs. Passive Management**

43.     The Harbor Fund and the Parnassus Fund are actively managed funds—that is, funds that rely on the professional judgment of their investment advisers to make decisions about the funds' portfolios of investments. For the Harbor Fund, a portfolio team decides the industries in which the fund will allocate assets, as well as what stocks to buy and sell and when. The Harbor Fund pays Harbor Capital Advisors, Inc. a fee for these services—a fee which the Harbor Fund passes on to investors, including the Plan's participants. Harbor's primary focus should be to outperform the Fund's stated benchmark, the Russell. Indeed, Harbor Capital Advisors charges fees for active management on the premise that the Harbor Fund can beat the Russell.

44.     Likewise, the Parnassus Fund is managed by a portfolio team that decides the industries in which the fund will allocate assets, as well as what stocks to buy and sell and when. The Parnassus Fund pays Parnassus Investments LLC a fee for these services—a fee which the Parnassus Fund passes on to investors, including the Plan's participants. Parnassus's primary focus should be to outperform the stated benchmark: the S&P. Parnassus charges fees for active management on the premise that the Parnassus Fund can beat the S&P.

45.     Active managers run the risk that their methods and analyses, including models, tools, and data, may be flawed or incorrect and may not achieve the fund's aim. Such errors could cause the fund to lag its benchmark. Market research suggests the vast majority of active managers fail to beat their benchmarks. Given that active managers are paid to beat their benchmark, chronic underperformance is a red flag that suggests investors are not getting their money's worth and should consider other investment options.

46.     Investment research and analysis typically drive the investment decisions of actively managed funds. Factors that an investment adviser may consider include, but are not

limited to, market trends, a company's financial condition, perceived risk of investing in the company, industry and sector outlook, and the underlying stocks' performances in various market conditions. Based on their respective professional judgment, one investment adviser may like issuers who focus on financial services while another may like media stocks, while a third may like investments in technology companies.

47.    Without variations between portfolio holdings, all large-cap stock funds would own identical investment portfolios and have nearly identical investment performance. Active management offers investors the opportunity to earn superior returns through the astute selection of investments. Astute selection typically drives superior investment performance over time and distinguishes the better-performing funds from the underperforming ones. Bad asset allocation and poor investment selection generally drive long-term underperformance.

48.    Most actively managed funds, however, consistently underperform their benchmarks. Therefore, keeping an actively managed fund that underperforms its benchmark over 3, 5 or 10-year periods is imprudent from a fiduciary perspective.

49.    Unlike actively managed funds, passively managed funds simply seek to replicate the holdings and investment performance of a designated benchmark index.

50.    The portfolio team of a passively managed fund makes few, if any, investment decisions besides constructing a portfolio that tracks that of the benchmark. Therefore, a passively managed fund typically will perform at or near the investment performance of its benchmark. Compared to actively managed funds, the fees for passively managed funds are significantly lower.

51.    In times of persistent underperformance, a passively managed fund, or index fund, is a viable option. Vanguard and BlackRock are well-known leaders in the passively managed fund space.

**B.     Investment Aims of Large-Cap Funds**

52.     The stocks of the biggest companies comprise a substantial portion of a large cap fund's portfolio. Typically, the investment aims of a large cap fund are to seek long-term growth of capital. How they seek that long-term growth varies, depending on the fund's investment style.

53.     The Harbor Fund is a large cap fund that employs a growth style. Funds with a growth style invest in stocks of companies that are projected to grow faster than other stocks. Growth is defined based on fast growth (high growth rates for earnings, sales, book value, and cash flow), high valuations (high price ratios) and low dividend yields.

54.     The Parnassus Fund is a large cap fund that employs a core style, which is a blend of growth-oriented stocks and value-oriented stocks. Value-oriented stocks are defined based on high intrinsic value (low price relative to earnings, sales, book value) low valuations (low price ratios), and high dividend yields.

55.     The principal aim of large-cap core funds is to provide investors with a mix of both income from dividends as well as long-term growth of capital.

**C.     Investment Risks of Large-Cap Funds**

56.     The principal categories of risks for the Harbor Fund and the Parnassus Fund include market risk, issuer risk, and the risk of investing in growth-oriented stocks.

57.     Market risk is the chance that stock prices overall will decline. Stock markets tend to move in cycles, with periods of rising prices and periods of falling prices, so each fund is subject to the risk that the market as a whole will fall.

58.     Issuer risk is the chance that prices of, and the income generated by, individual securities of companies held by the fund may decline in response to various factors directly related to the issuers of such securities, including reduced demand for an issuer's goods or services, poor

13

management performance, major litigation, investigations, or other controversies related to the issuer.

59.    Investing in growth-oriented stocks carries additional risk. Such stocks (e.g., NVIDA) may experience larger price swings and greater potential for loss than other types of stocks, such as those that are considered value-oriented or those that historically have paid continuous dividends (e.g., Bristol Myers).

**D.    Potential Investment Rewards of Actively Managed Large-Cap Funds: Fiduciaries Select Benchmarks to Evaluate Achievement of Potential Rewards**

60.    Investments are judged by their investment performance. Typically, investors want a portfolio that consists of investments that meet or exceed their respective benchmarks. Whether an investment performs well relative to its benchmark is concrete rather than abstract.

61.    For an actively managed investment fund, the potential reward is that the fund will deliver positive investment returns that exceed those of its benchmark. Investment advisers select benchmarks that they believe have similar aims, risks, and potential rewards as those of their fund.

62.    Harbor Capital publishes comprehensive information about the Harbor Fund that investors can read. This is commonly referred to as the "Fund Fact Sheet." The Harbor Fund's Fact Sheet identifies the Russell as the Harbor Fund's sole benchmark.

63.    Parnassus also publishes a Fund Fact Sheet. It identifies the S&P as the Parnassus Fund's sole benchmark.

## VIII.   THE HARBOR FUND AND ITS COMPARATORS

**A.    Harbor Fund**

64.    The Harbor Fund's aim is to seek long-term growth of capital.

65.    The Fund pursues its aim by investing primarily in equity securities, emphasizing common and preferred stocks of U.S. companies with market capitalizations of at least $1 billion at the time of purchase and that are considered to have above-average prospects for growth.

66.    Currently, approximately 93% of the Fund's portfolio is invested in large-cap stocks. Among its top holdings are stocks in NVIDIA, Microsoft, and Broadcom.

67.    The Harbor Fund's potential rewards are that it will generate positive investment returns that outperform the Russell.

68.    The Harbor Fund's principal risks are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks. By investing a significant portion of its assets in stocks, including growth-oriented stocks, the Harbor Fund is considered as having a very aggressive risk profile.

69.    The Harbor Fund is not the only large-cap growth fund on the market with the same mix of aims, risks, and potential rewards as described above. As shown below, numerous substantially similar funds have existed throughout the Class Period and before.

   **i.    Comparator 1: Fidelity Blue Chip Growth Fund**

70.    The Fidelity Blue Chip Growth Fund (the "Fidelity Fund") has similar aims, risks, and potential rewards to those of the Harbor Fund.

71.    Like the Harbor Fund, the Fidelity Fund is an actively managed large-cap growth fund.

72.    The Fidelity Fund's aim is to seek capital appreciation. The Fidelity Fund pursues its aim by investing primarily in common stocks of companies that have above-average growth potential.

73.    Currently, approximately 85% of the Fidelity Fund's portfolio is invested in large-cap stocks. Like the Harbor Fund, the Fidelity Fund's top holdings include equities in NVIDIA, Microsoft, and Broadcom.

74.    The Fidelity Fund's potential rewards are that the fund will generate positive investment returns that outperform the Russell. Its principal risks are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks. By investing a significant portion of its assets in stocks, including growth-oriented stocks, the Fidelity Fund, like the Harbor Fund, is considered as having a very aggressive risk profile.

75.    The aims, risks, and potential rewards of the Fidelity Fund are similar to those of the Harbor Fund given the similarities in the two funds' investment strategies, the types of stocks the two funds own, and their very aggressive risk profiles. Moreover, both funds are actively managed investment options that seek to outperform relative to the same benchmark, the Russell. These facts make the Fidelity Fund a meaningful comparator to the Harbor Fund.

### ii.    Comparator 2: JPMorgan Large Cap Growth Fund

76.    The JPMorgan Large Cap Growth Fund (the "JPMorgan Fund") has similar aims, risks, and potential rewards to those of the Harbor Fund.

77.    Like the Harbor Fund, the JPMorgan Fund is an actively managed large-cap growth fund.

78.    The JPMorgan Fund's aim is to seek long-term capital appreciation. The JPMorgan Fund pursues its aim by investing primarily in equity securities of large-capitalization companies whose market capitalizations are similar to those within the universe of the Russell.

79.    Like the Harbor Fund, the J.P. Morgan Fund's Fact Sheet identifies the Russell as its benchmark.

80.     Currently, approximately 90% of the JPMorgan Fund's portfolio is invested in large-cap stocks. Like the Harbor Fund, the JPMorgan Fund's top holdings include equities in NVIDIA, Microsoft, and Broadcom.

81.     The JPMorgan Fund's potential rewards are that the fund will generate positive investment returns that outperform the Russell. Its principal risks are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks. By investing a significant portion of its assets in stocks, including growth-oriented stocks, the JPMorgan Fund, like the Harbor Fund, is considered as having a very aggressive risk profile.

82.     The aims, risks, and potential rewards of the JPMorgan Fund are similar to those of the Harbor Fund given the similarities in the two funds' investment strategies, the types of stocks the two funds own, and their very aggressive risk profiles. Moreover, both funds are actively managed investment options that seek to outperform relative to the same benchmark, the Russell 1000 Growth Index. These facts make the JPMorgan Fund a meaningful comparator to the Harbor Fund.

### iii.     Comparator 3: Vanguard Russell 1000 Growth Index Fund

83.     The Vanguard Russell 1000 Growth Index Fund (the "Vanguard Fund") is a passively managed index fund that seeks to track the performance the Russell. The Vanguard Fund attempts to replicate the Russell by investing its assets in the stocks that make up the Russell.

84.     Currently, approximately 87% of the Vanguard Fund's portfolio is invested in large-cap stocks. Like the Harbor Fund, the Vanguard Fund's top holdings include stocks in NVIDIA, Microsoft, and Broadcom.

85.     The Vanguard Fund's potential rewards are that it will generate investment returns in line with the Russell. The Vanguard Fund's principal risks are related to (1) market risk,

(2) issuer risk, and (3) investing in growth-oriented stocks. By investing a significant portion of its assets in stocks, including growth-oriented stocks, the Vanguard Fund, like the Harbor Fund, is considered as having a very aggressive risk profile.

86.    The aims, risks, and potential rewards of the Vanguard Fund are similar to those of the Harbor Fund given the two funds' investment strategies, the types of stocks the two funds own, and their very aggressive risk profiles. This makes the Vanguard Fund a meaningful Comparator for the Harbor Fund.

87.    The most telling difference between the Harbor Fund and the Vanguard Fund relates to their fees. As shown in the table below, the fees of the Harbor Fund are nearly six-times the fees of the Vanguard Fund, yet, as illustrated in Section VIII below, the Vanguard Fund has significantly superior investment performance.

| Fund Name | Fees |
|---|---|
| Harbor Capital Appreciation CIT Class 4 (Plan option 2020-2022) | 4l bps |
| Harbor Capital Appreciation CIT Class R (Plan option post-2022) | 35 bps |
| The Vanguard Russell 1000 Growth Index | 6 bps |

### iv.    Comparator 4: BlackRock Russell 1000® Growth Fund

88.    The BlackRock Russell 1000® Growth Fund (the "BlackRock Fund") is also a passively managed index fund that seeks to track the results of the Russell by investing its assets in the stocks that make up the Russell.

89.     Currently, approximately 87% of the BlackRock Fund's portfolio is invested in large-cap stocks. Like the Harbor Fund, the Vanguard Fund's top holdings include equities in NVIDIA, Microsoft, and Broadcom.

90.     The BlackRock Fund's potential rewards are that it will generate investment returns in line with the Russell. The BlackRock Fund's principal risks are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks. By investing a significant portion of its assets in stocks, including growth-oriented stocks, the BlackRock Fund, like the Harbor Fund, is considered as having a very aggressive risk profile.

91.     The aims, risks, and potential rewards of the BlackRock Fund are similar to those of the Harbor Fund given the two funds' investment strategies, the types of stocks the two funds own, and their very aggressive risk profiles the BlackRock Fund . This makes the BlackRock Fund a meaningful comparator for the Harbor Fund.

92.     Similar to the Vanguard Fund comparison, the most telling difference between the Harbor Fund and the BlackRock Fund relates to their fees. Based on information and belief, the fees of the Harbor Fund are nearly six-times the fees of the BlackRock Fund, yet, as illustrated in Section VIII below, the BlackRock Fund has significantly superior investment performance.

**v.    Comparator 5: Russell 1000 Growth Index**

93.     In the Harbor Fund's Fact Sheets, Harbor Capital discloses to the investing public that the Russell is the Harbor Fund's sole benchmark. Therefore, the investment adviser of the Harbor Fund – the entity most knowledgeable about the fund - necessarily concludes that the Fund and Russell share similar aims, risks, and rewards.

94.     The Russell measures the performance of the large-cap growth segment of the U.S. stock market. It includes those Russell 1000 companies that are similar to the companies included

in the Harbor Fund—those with large capitalizations, relatively higher price-to-book ratios, higher forecast medium-term growth, and higher sales-per-share historical growth (i.e., growth companies).

95.     Like the Harbor Fund, the Russell's top holdings include equities in NVIDIA, Microsoft, and Broadcom.

96.     By virtue of the similarities in their respective holdings and market capitalizations, the Russell and the Harbor Fund share similar aims, rewards, and levels of risk, including market risk and issuer risk. This makes the Russell a meaningful benchmark for the Harbor Fund.

## IX.     THE PARNASSUS FUND AND ITS COMPARATORS AND BENCHMARK

### B.     Parnassus Fund

97.     The Parnassus Fund is an actively managed large cap core fund. Its aim is total return comprised of both income from dividends and long-term capital appreciation.

98.     The Parnassus Fund pursues its aim by investing primarily in a diversified portfolio of U.S. equity securities.

99.     Currently, approximately 87% of the Parnassus Fund's portfolio is invested in large-cap stocks. Among the Fund's top holdings are Microsoft, Apple, Broadcom, and NVIDIA.

100.     The Parnassus Fund's potential rewards are that it will generate positive investment returns that outperform the S&P. The Parnassus Fund's principal risks are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks. By investing a significant portion of its assets in stocks, including both growth and value-oriented stocks, the Parnassus Fund is considered as having an aggressive risk profile.

101.    The Parnassus Fund is not the only large-cap core fund on the market with the same mix of aims, risks, and potential rewards as described above. As set forth below, numerous substantially similar funds have existed throughout the Class Period.

### i.    Comparator 1: T. Rowe Price U.S. Equity Research Fund

102.    Like the Parnassus Fund, the T. Rowe Price U.S. Equity Research Fund (the "T. Rowe Price Fund") is an actively managed large cap core fund.

103.    The T. Rowe Price Fund is managed by T. Rowe Price Associates, Inc.

104.    The T. Rowe Price Fund has similar aims, risks, and potential rewards to those of the Parnassus Fund.

105.    The T. Rowe Price Fund's aim is to seek long-term capital growth by investing primarily in large-cap U.S. common stocks.

106.    Like the Parnassus Fund, the T. Rowe Price Fund identifies the S&P as one of its benchmarks.

107.    Currently, approximately 81% of the T. Rowe Price Fund's portfolio is invested in large-cap stocks. Like the Parnassus Fund, the T. Rowe Price Fund's top holdings include Microsoft, Apple, Broadcom, and J.P. Morgan Chase.

108.    The T. Rowe Price Fund's potential rewards are that the fund will generate positive investment returns that outperform the S&P 500. The T. Rowe Price Fund's principal risks are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks. By investing a significant portion of its assets in stocks, including growth-oriented stocks and value-oriented stocks, the T. Rowe Price Fund, like the Harbor Fund, is considered as having an aggressive risk profile.

109.    The aims, risks, and potential rewards of the T. Rowe Price Fund are similar to those of the Parnassus Fund given the similarities in the two funds' investment strategies, the types of stocks the two funds own, and their aggressive risk profiles. Moreover, both funds are actively managed investment options that seek to outperform the same benchmark, the S&P. These facts make the T. Rowe Price Fund a meaningful comparator to the Parnassus Fund.

### ii.    Comparator 2: Putnam U.S. Research Fund

110.    Like the Parnassus Fund, the Putnam U.S. Research Fund (the "Putnam Fund") is an actively managed large-cap blend fund.

111.    The Putnam Fund is managed by Putnam Investment Management, LLC.

112.    The Putnam Fund has similar aims, risks, and potential rewards to those of the Parnassus Fund.

113.    The aim of the Putnam Fund is capital appreciation. Under normal circumstances, the fund will invest at least 80% of its net assets in equity securities of companies located in the United States.

114.    Like the Parnassus Fund, the Putnam Fund identifies the S&P 500 Index as one of its benchmarks.

115.    Morningstar classifies the Putnam Fund as a large-cap blend fund. Currently, approximately 84% of the Putnam Fund's portfolio is invested in large-cap stocks. Like the Parnassus Fund, Putnam's top holdings include Microsoft, Apple, Mastercard, and Broadcom.

116.    The Putnam Fund's potential rewards are that the fund will generate positive investment returns that outperform its S&P. The Putnam Fund's principal risks are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks. By investing a significant portion of its assets in stocks, including both growth and value-oriented

stocks, the Putnam Fund, like the Parnassus Fund, is considered as having an aggressive risk profile.

117.    The aims, risks, and potential rewards of the Putnam Fund are similar to those of the Parnassus Fund given the similarities in the two funds' investment strategies, the types of stocks the two funds own, and their aggressive risk profiles. Moreover, both funds are actively managed investment options that seek to outperform same benchmark, the S&P. These facts make the Putnam Fund a meaningful comparator to the Parnassus Fund.

### iii.    Comparator 3: Vanguard 500 Index Fund

118.    The Vanguard 500 Index Fund (the "Vanguard Fund") is a passively managed index fund that seeks to track the performance the S&P. The Vanguard Fund attempts to replicate the S&P 500 Index by investing its assets in the stocks that make up the S&P.

119.    Currently, approximately 81% of the Vanguard Fund's portfolio is invested in large-cap stocks. Like the Parnassus Fund, Vanguard's top holdings include Apple, Broadcom, and Microsoft.

120.    The Vanguard Fund's potential rewards are that it will generate investment returns in line with the 500 Index. The Vanguard Fund's principal risks are related to (1) market risk, (2) issuer risk, and (3) investing in growth-oriented stocks. By investing a significant portion of its assets in stocks, including both growth and value-oriented stocks, the Vanguard Fund, like the Parnassus Fund, is considered as having an aggressive risk profile.

121.    By virtue of the similarities in the two funds' investment strategies, the types of stocks the two funds own, and aggressive risk profiles, the Vanguard Fund and the Parnassus Fund share similar aims, rewards, and levels of risk. This makes the Vanguard Fund a meaningful Comparator for the Parnassus Fund.

122.    The most telling difference between the Parnassus Fund and the Vanguard Fund comes from the fees. As shown in the table below, the total net fees and expenses of the Vanguard Fund are significantly less than those of the Parnassus Fund, and as illustrated in Section VIII below, the Vanguard Fund handily outperforms the Parnassus Fund.

| Fund Name | Fees |
|---|---|
| Parnassus Sustainable Core Equity CIT 1 | 0.49% |
| Vanguard 500 Index Admiral | 0.04% |

### iv.    Comparator 4: Fidelity 500 Index Fund

123.    The Fidelity 500 Index Fund (the "Fidelity Fund") is a passively managed index fund that seeks to track the performance of the S&P 500 by investing its assets in the stocks that make up the S&P.

124.    Currently, approximately 81% of the Fidelity Fund's portfolio is invested in large-cap stocks.

125.    Like the Parnassus Fund, the Fidelity Fund's top holdings include Apple, Broadcom, and Microsoft.

126.    The Fidelity Fund's potential rewards are that it will generate investment returns in line with the S&P. The Fidelity Fund's principal risks are related to (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks. Morningstar identifies the Fidelity Fund's risk profile as aggressive.

127.    By virtue of the similarities in their investment strategies, the types of stocks the two funds hold, and their aggressive risk profiles, the Fidelity Fund is a meaningful comparator for the Parnassus Fund.

128.    The most telling difference between the Parnassus Fund and the Fidelity Fund comes from the fees. As shown in the table below, the net fees and expenses of the Fidelity Fund are significantly less than those of the Parnassus Fund, and as illustrated in Section VIII below, the Fidelity Fund handily outperforms the Parnassus Fund.

| Fund Name | Fees |
|---|---|
| Parnassus Dividend Growth Fund I | 0.49% |
| Fidelity 500 Index | 0.15% |

### v.    Comparator 5: S&P 500 Index

129.    Parnassus has disclosed to the investing public that the Parnassus Fund is benchmarked to the S&P. Therefore, the investment adviser of the Parnassus Fund necessarily concluded that the S&P shares similar aims, risks, and rewards.

130.    The S&P measures the performance of the large-cap segment of the U.S. stock market. It includes five-hundred leading U.S. companies, the same type of stocks that the Parnassus Fund holds. Like the Parnassus Fund, the S&P's top holdings include NVIDIA, Apple, and Microsoft.

131.    By virtue of the similarities in their respective market capitalizations and holdings, the S&P and the Parnassus Fund share similar aims, rewards, and levels of risk, including market risk and issuer risk. This makes the S&P a meaningful benchmark for the Parnassus Fund.

### X.     THE CHALLENGED FUNDS UNDERPERFORMED THEIR BENCHMARKS AND COMPARATOR FUNDS FOR OVER A DECADE

132.     Poor investment performance can torpedo a participant's retirement savings. For example, a 35-year-old participant with $100,000 in retirement savings will see that grow to $761,000 by retirement age, assuming a 7% return and no further contributions or withdrawals. However, that same $100,000 with a lower investment return of 6.50% will grow to only $661,000. An investment option that underperforms by a mere half a percent has a material impact on a participant's retirement savings.

133.     For a prudent fiduciary, investment options that, on average, underperform their benchmarks over trailing three or five-year periods are generally candidates for removal. Such guidelines are often outlined in a plan's investment policy statement.

134.     The Department of Labor, in Interpretive Bulletin 94-1 (June 23, 1994), states: ". . . because every investment necessarily causes a plan to forgo other investment opportunities, an investment will not be prudent if it would be expected to provide a plan with a lower rate of return than available alternative investments with commensurate degrees of risk or is riskier than alternative available investments with commensurate rates of return."

135.     The long-term underperformance illustrated in the tables below raises a plausible inference that both the Harbor Fund and the Parnassus Fund could not be expected to provide higher investment returns and therefore were not prudent investments; and that their retention in the Plan was the product of an imprudent process.

### A.     Harbor Fund

136.     Had the Bloomberg Defendants fulfilled their duty with the care and skill of a prudent fiduciary, they would have removed the Harbor Fund by the start of the Class Period.

Indeed, by December 31, 2019, the Harbor Fund had underperformed the Russell and each Comparator Fund over the preceding five- and ten-year periods.

137.    Between 2010 and 2019, the Harbor Fund's underperformance cost the Plan and its participants between approximately $18 million and $40 million in retirement savings.

138.    A prudent fiduciary would have realized that the Harbor Fund did not warrant the fees that it was charging for active management. Even though the Harbor Fund failed to beat its Russell benchmark, its fees were nearly six times the Vanguard Fund's fees.

139.    **Table 1.a** below demonstrates the underperformance of the Harbor Fund compared to the Russell and to the Comparator Funds for the ten-year period from January 1, 2010, through December 31, 2019. By late 2019, Defendants should have recognized that the Harbor Fund was a terrible encumbrance to the Plan and should be removed.

**Table 1.a**

**January 1, 2010—December 31, 2019**

| Fund Name | Cumulative Performance | Annualized Performance | Growth of $79 Million |
|---|---|---|---|
| Harbor Capital Appreciation Institutional | 288.93% | 14.55% | $306.1 million |
| Russell 1000 Growth TR | 312.34% | 15.22% | $324.5 million |
| *+/- Harbor Capital* | *-23.41%* | *-0.67%* | *-$18.4 million* |
| Fidelity Blue Chip Growth K | 340.63% | 15.99% | $346.7 million |
| *+/- Harbor Capital* | *-51.70%* | *-1.44%* | *-$40.6 million* |
| JPMorgan Large Cap Growth R6 | 332.61% | 15.77% | $340.4 million |
| *+/- Harbor Capital* | *-43.68%* | *-1.22%* | *-$34.3 million* |
| The Vanguard Russell 1000 Growth Index | 313.11% | 15.24% | $325.1 million |
| *+/- Harbor Capital* | *-24.18%* | *-0.69%* | *-$19.0 million* |
| BlackRock Russell 1000 Growth Fund F | 314.72% | 15.29% | $326.3 million |
| *+/- Harbor Capital* | *-25.79%* | *-0.74%* | *-$20.2 million* |

140.    Underperformance of 0.67% relative to the Russell is significant. For a 35-year-old participant with $100,000 savings, this underperformance could rob the participant in excess of $130,000 of retirement savings over the course of their working years. Relative to the Fidelity Blue Chip Growth Fund, the 1.44% in underperformance would cost the participant close to $240,000.

141.    Yet the Defendants failed to remove the Habor Fund. And the Harbor Fund continued to perform poorly throughout the Class Period.

142.    **Table 1.b**, below illustrates the underperformance of the Harbor Fund from January 1, 2020, through December 31, 2025, on an annual and cumulative basis relative to the Russell and the Comparator Funds. Though the Harbor Fund outperformed the Russell and certain Comparator Funds in one or two years out of six, that outperformance was overshadowed by the four and five years in which the Harbor Fund underperformed the Russell and the Comparator Funds. The Harbor Fund underperformed the Russell in four of the six years and cumulatively by over 24%.

**Table 1.b**
**January 1, 2020—December 31, 2025**

| Fund | Annualized Performance | | | | | | Cumulative Compounded Performance |
|---|---|---|---|---|---|---|---|
| | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** | |
| Harbor Capital Institutional Fund[5] | 54.43% | 15.79% | -37.39% | 53.44% | 31.08% | 14.74% | 158.37% |
| Russell 1000 Growth TR | 38.49% | 27.60% | -29.14% | 42.68% | 33.36% | 18.56% | 182.49% |
| *+/- Harbor Capital* | *15.94%* | *-11.81%* | *-8.25%* | *10.76%* | *-2.28%* | *-3.82%* | *-24.12%* |
| Fidelity Blue Chip Growth K | 62.38% | 22.81% | -38.40% | 55.76% | 39.80% | 19.99% | 220.93% |
| *+/- Harbor Capital* | *-7.95%* | *-7.02%* | *1.01%* | *-2.32%* | *-8.72%* | *-5.25%* | *-62.56%* |
| JPMorgan Large Cap Growth R6 | 56.42% | 18.79% | -25.21% | 34.95% | 34.17% | 14.40% | 187.85% |
| *+/- Harbor Capital* | *-1.99%* | *-3.00%* | *-12.18%* | *18.49%* | *-3.09%* | *0.34%* | *-29.48%* |
| The Vanguard Russell 1000 Growth Index | 38.50% | 27.61% | -29.14% | 42.74% | 33.35% | 18.56% | 182.65% |
| *+/- Harbor Capital* | *15.93%* | *-11.82%* | *-8.25%* | *10.70%* | *-2.27%* | *-3.82%* | *-24.28%* |
| BlackRock Russell 1000 Growth Fund F | 38.60% | 27.64% | -29.14% | 42.68% | 33.30% | 18.50% | 182.53% |
| *+/- Harbor Capital* | *15.83%* | *-11.85%* | *-8.25%* | *10.76%* | *-2.22%* | *-3.76%* | *-24.16%* |

| |
|---|
| Underperformed by < 2% |
| Underperformed by ≥ 2% |
| Underperformed by ≥ 4% |
| Underperformed by ≥ 6% |

---

[5] In and around 2021, the Plan switched from offering the Harbor Capital Appreciation Mutual Fund Institutional share class to the Harbor Capital Appreciation Collective Investment Trust (CIT) Class 4. The Plan switched its offering again in and around 2023, when it changed to the Class R of the Harbor Capital Appreciation CIT. The annual and cumulative performance calculations shown in **Tables 1.b** and **1.c** use the Harbor Capital Appreciation Institutional mutual fund performance data for 2020 and the Harbor Capital Appreciation CIT Class 4 and Class R for 2021 through 2022 and 2023 through the present, respectively.

143.    Together, **Tables 1.a** and **1.b** capture the depth and the breadth of the Harbor Fund's underperformance relative to the Russell that have persisted in the Plan for more than fifteen years.

144.    All the data presented in each of the above **Tables 1.a** and **1.b** was available in real time to the Bloomberg Defendants throughout the Class Period.

145.    Defendants' failure to remove the Harbor Fund cost Plan participants millions of dollars in retirement savings. On average, during the period from January 1, 2020, through December 31, 2024, the assets of the Harbor Fund were approximately $294 million.

146.    **Table 1.c** below compares the investment growth of $294 million invested in the Harbor Fund to the growth of $294 million invested in each of the Comparator Funds from January 1, 2020, through December 31, 2025. As the Table shows, participants would have substantially more dollars in retirement savings had Defendants replaced the Harbor Fund with any of the Comparator Funds.

**Table 1.c**

**January 1, 2020—December 31, 2025**

| Fund Name | Cumulative Performance | Annualized Performance | Growth of $294 Million |
|---|---|---|---|
| Harbor Capital Appreciation Institutional[6] | 158.37% | 17.14% | $759.7 million |
| Russell 1000 Growth TR | 182.49% | 18.90% | $830.6 million |
| *+/- Harbor Capital* | *-24.12%* | *-1.76%* | *-$70.9 million* |
| Fidelity Blue Chip Growth K | 220.93% | 21.45% | $943.6 million |
| *+/- Harbor Capital* | *-62.56%* | *-4.31%* | *-$183.9 million* |
| JPMorgan Large Cap Growth R6 | 187.85% | 19.27% | $846.4 million |
| *+/- Harbor Capital* | *-29.48%* | *-2.13%* | *-$86.7 million* |
| The Vanguard Russell 1000 Growth Index | 182.65% | 18.91% | $831.1 million |
| *+/- Harbor Capital* | *-24.28%* | *-1.77%* | *-$71.4 million* |
| BlackRock Russell 1000 Growth Fund F | 182.53% | 18.90% | $830.7 million |
| *+/- Harbor Capital* | *-24.16%* | *-1.76%* | *-$71.0 million* |

147.    The Comparator Funds listed in each of the above Tables are managed by reputable investment advisers with significant assets under management and are available to all large retirement plans, including Bloomberg's Plan. Bloomberg would not have had to scour the market to find them.

148.    Defendants owed a fiduciary duty to remove the Harbor Fund within a reasonable time after it manifested poor performance. Yet they retained the Harbor Fund year after year, even though it failed to beat the Russell and the Comparator Funds spanning a period of 15 years.

---

[6] In and around 2021, the Plan switched from offering the Harbor Capital Appreciation Mutual Fund Institutional share class to the Harbor Capital Appreciation Collective Investment Trust (CIT) Class 4. The Plan switched its offering again in and around 2023, when it changed to the Class R of the Harbor Capital Appreciation CIT. The annual and cumulative performance calculations shown in **Tables 1.b** and **1.c** use the Harbor Capital Appreciation Institutional mutual fund performance data for 2020 and the Harbor Capital Appreciation CIT Class 4 and Class R for 2021 through 2022 and 2023 through the present, respectively.

**B.      Parnassus Fund**

149.    **Table 2.a** below demonstrates the underperformance of the Parnassus Fund compared to the S&P and Comparator Funds for the five-year period from January 1, 2015, through December 31, 2019. By late 2019, any Defendants should have recognized that the Parnassus Fund was a terrible encumbrance to the Plan and should be removed.

**Table 2.a**
**January 1, 2015—December 31, 2019**

| Fund Name | Cumulative Performance | Annualized Performance |
|---|---|---|
| Parnassus Core Equity Institutional | 68.72% | 11.03% |
| S&P 500 TR | 73.86% | 11.70% |
| *+/- Parnassus* | *-5.14%* | *-0.67%* |
| T. Rowe Price U.S. Equity Research Z (PCUZX) | 77.28% | 12.13% |
| *+/- Parnassus* | *-8.56%* | *-1.10%* |
| Putnam U.S. Research R6 (PLJMX) | 71.96% | 11.45% |
| *+/- Parnassus* | *-3.24%* | *-0.42%* |
| Fidelity 500 Index (FXAIX) | 73.79% | 11.69% |
| *+/- Parnassus* | *-5.07%* | *-0.66%* |
| Vanguard 500 Index Admiral (VFIAX) | 73.59% | 11.66% |
| *+/- Parnassus* | *-4.87%* | *-0.63%* |

150.    Underperformance of 0.67% relative to the S&P is not insignificant. For a 35-year-old participant with $100,000 savings, this underperformance could rob the participant in excess of $130,000 of retirement savings over the course of their working years. Yet the Defendants failed to remove the Parnassus Fund. And the Parnassus Fund continued to perform poorly throughout the Class Period.

151.    **Table 2.b**, below, illustrates the underperformance of the Parnassus Fund from January 1, 2020, through December 31, 2025, on an annual and cumulative basis relative to the

S&P and the Comparator Funds. Though the Harbor Fund occasionally outperformed the S&P and certain Comparator Funds, that outperformance was overshadowed by the multiple years in which the Harbor Fund underperformed the S&P and the Comparator Funds. The Harbor Fund underperformed the S&P in five of the six years and cumulatively by over 19%.

**Table 2.b**
**January 1, 2020—December 31, 2025**

| Fund | Annualized Performance | | | | | | Cumulative Compounded Performance |
|---|---|---|---|---|---|---|---|
| | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** | |
| Parnassus Core Equity Institutional | 21.47% | 27.82% | -18.17% | 25.22% | 19.13% | 12.08% | 112.42% |
| S&P 500 TR | 18.40% | 28.71% | -18.11% | 26.29% | 25.02% | 17.88% | 132.25% |
| *+/- Parnassus* | *3.07%* | *-0.89%* | *-0.06%* | *-1.07%* | *-5.89%* | *-5.80%* | *-19.83%* |
| T. Rowe Price U.S. Equity Research Z (PCUZX) | 19.81% | 28.02% | -18.44% | 30.37% | 27.02% | 16.87% | 142.07% |
| *+/- Parnassus* | *1.66%* | *-0.20%* | *0.27%* | *-5.15%* | *-7.89%* | *-4.79%* | *-29.65%* |
| Putnam U.S. Research R6 (PLJMX) | 20.47% | 24.65% | -17.02% | 29.28% | 26.67% | 18.45% | 141.71% |
| *+/- Parnassus* | *1.00%* | *3.17%* | *-1.15%* | *-4.06%* | *-7.54%* | *-6.37%* | *-29.29%* |
| Fidelity 500 Index (FXAIX) | 18.40% | 28.69% | -18.13% | 26.29% | 25.00% | 17.86% | 132.10% |
| *+/- Parnassus* | *3.07%* | *-0.87%* | *-0.04%* | *-1.07%* | *-5.87%* | *-5.78%* | *-19.68%* |
| Vanguard 500 Index Admiral (VFIAX) | 18.37% | 28.66% | -18.15% | 26.24% | 24.97% | 17.83% | 131.71% |
| *+/- Parnassus* | *3.10%* | *-0.84%* | *-0.02%* | *-1.02%* | *-5.84%* | *-5.75%* | *-19.29%* |

| |
|---|
| Underperformed by < 2% |
| Underperformed by ≥ 2% |
| Underperformed by ≥ 4% |
| Underperformed by ≥ 6% |

152.    Together, **Tables 2.a** and **2.b** capture the depth and the breadth of the Parnassus Fund's underperformance relative to meaningful benchmarks that has persisted for more than fifteen years.

153.    All the data presented in each of the above **Tables 2.a** and **2.b** was available in real time to the Bloomberg Defendants throughout the Class Period.

154.    Defendants' failure to remove the Parnassus Fund cost Plan participants millions of dollars in retirement savings. On average, during the period from January 1, 2020, through December 31, 2025, the assets of the Parnassus Fund were approximately $47 million. **Table 2.c** below compares the investment growth of $47 million invested in the Parnassus Fund to the growth of $47 million invested in each of the Comparator Funds from January 1, 2020, through December 31, 2025. As the Table shows, Participants would have substantially more dollars in retirement savings had Defendants replaced the Parnassus Fund with any of the Comparator Funds.

**Table 2.c**
**January 1, 2020—December 31, 2025**

| Fund Name | Cumulative Performance | Annualized Performance | Growth of $47 Million |
|---|---|---|---|
| Parnassus Core Equity Institutional | 112.42% | 13.38% | $99.4 million |
| S&P 500 TR | 132.25% | 15.08% | $108.7 million |
| *+/- Parnassus* | *-19.83%* | *-1.70%* | *-$9.3 million* |
| T. Rowe Price U.S. Equity Research Z (PCUZX) | 142.07% | 15.88% | $113.3 million |
| *+/- Parnassus* | *-29.65%* | *-2.50%* | *-$13.9 million* |
| Putnam U.S. Research R6 (PLJMX) | 141.71% | 15.85% | $113.1 million |
| *+/- Parnassus* | *-29.29%* | *-2.47%* | *-$13.7 million* |
| Fidelity 500 Index (FXAIX) | 132.10% | 15.07% | $108.6 million |
| *+/- Parnassus* | *-19.68%* | *-1.69%* | *-$9.2 million* |
| Vanguard 500 Index Admiral (VFIAX) | 131.71% | 15.03% | $108.4 million |
| *+/- Parnassus* | *-19.29%* | *-1.65%* | *-$9.0 million* |

155.    The Comparator Funds listed in each of the above Tables are managed by reputable investment advisers with significant assets under management and are available to all large retirement plans, including Bloomberg's Plan. Bloomberg would not have had to scour the market to find them.

156.    Defendants owed a fiduciary duty to remove the Parnassus Fund within a reasonable time after it manifested poor performance. Yet they retained the Parnassus Fund year after year, even though it failed to beat the S&P.

## XI.    CLASS ACTION ALLEGATIONS

157.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under ERISA § 409(a), 29 U.S.C. § 1109(a). Plaintiff Rajkumar

Rajappan brings this suit in a representative capacity on behalf of the Plan and its participants and beneficiaries pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a), seeking appropriate Plan-wide relief under ERISA § 409, 29 U.S.C § 1109, to protect the interests of the Plan.

158.    In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to a direct individual action on behalf of the Plan under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), Plaintiffs seek to certify this action as a class action on behalf of participants and beneficiaries of the Plan. Specifically, Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

a.    All participants and beneficiaries of the Plan who invested in either the Harbor Fund or the Parnassus Fund from January 29, 2021, through the date of judgment, excluding the Bloomberg Defendants, and any officers or employees of the Bloomberg Defendants with responsibility for the Plan's investment or administrative function.

159.    This action meets the requirements of Federal Rule of Civil Procedure 23 and is certifiable as a class action for the following reasons:

a.    The Class includes thousands of members and is so large that joinder of all its members is impracticable.

b.    There are numerous questions of law and fact common to this Class because the Bloomberg Defendants owed the same fiduciary duties to the Plan and to all participants and beneficiaries and took a common course of actions and omissions as alleged herein as to the Plan, and not as to any individual participant, that affected all Class members through their participation in the Plan in the same way. Thus, questions of law and fact common to the Class include, without limitation, the

following: (i) whether each of the Defendants are fiduciaries liable for the remedies provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (ii) whether the fiduciaries of the Plan breached their fiduciary duties to the Plan by employing an imprudent process for monitoring and evaluating Plan investment options; (iii) whether the fiduciaries of the Plan breached their fiduciary duties to the Plan by retaining an imprudent investment for an unreasonable amount of time; (iv) whether Plaintiffs' claims of an imprudent process require similar inquiries and proof of the claims, and therefore implicate the same set of concerns, for all proposed members of the Class; (iv) what are the losses to the Plan resulting from each breach of fiduciary duty; and (v) what Plan-wide equitable and other relief the Court should impose in light of the Bloomberg Defendants' breach of duties.

c.  Plaintiffs' claims are typical of the claims of the Class because Plaintiffs were Plan participants who invested in the Challenged Funds during the Class Period, and all participants in the Plan who invested in the Challenged Funds were harmed by the Bloomberg Defendants' misconduct.

d.  Plaintiffs are adequate representatives of the Class because they participated in the Plan during the Class Period, invested in the Challenged Funds, have no interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e.  There are no substantial individualized questions of law or fact among Class members on the merits of this Action.

160.    Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the Bloomberg Defendants in respect to the discharge of their fiduciary duties to the Plan and their personal liability to the Plan under ERISA § 409(a), 29 U.S.C. § 1109(a). Moreover, adjudications by individual participants and beneficiaries regarding the alleged breaches of fiduciary duties, and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

161.    Additionally, or in the alternative, certification under Rule 23(b)(2) is appropriate because the Bloomberg Defendants have acted or refused to act on grounds that apply generally to the Class, so that declaratory relief is appropriate respecting the Class as a whole.

162.    Additionally, or in the alternative, this action may be certified as a class under Rule 23(b)(3). A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and it is impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no Class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

163.    Additionally, or alternatively, this action may be certified as to particular issues under Rule 23(c)(4), including, but not limited to, the Defendants' liability to the Class for their allegedly imprudent conduct.

164.    Plaintiffs' counsel will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

## CAUSES OF ACTION

### COUNT I

**Breach of Duty of Prudence by Failing to Remove Imprudent Investments from the Plan Within a Reasonable Time**
**(Violation of ERISA § 404 29 U.S.C. § 1104)**
**(Against All Defendants)**

161.    All allegations set forth in the Complaint are realleged and incorporated herein by reference.

162.    At all relevant times during the Class Period, the Bloomberg Defendants acted as fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A) by exercising authority and control with respect to the management of the Plan and its assets, and/or by rendering investment advice or by having authority or responsibility to render investment advice to the Plan, and/or were designated in the governing Plan documents as a named fiduciary within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a).

163.    ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), requires a plan fiduciary to act with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

164.    Thus, under ERISA, the Bloomberg Defendants are responsible for evaluating and monitoring the Plan's investments on an ongoing basis, eliminating imprudent investments, and taking all necessary steps to ensure the Plan's assets are invested prudently.

165.    The Bloomberg Defendants breached their fiduciary duties through an imprudent process for investigating, evaluating, and monitoring investments. The faulty process resulted in a Plan that included the two Challenged Funds that suffered poor performance for well over a decade. Bloomberg Defendants failed to remove the Challenged Funds within a reasonable time despite historical underperformance relative to their relevant benchmarks and Comparator Funds.

166.    By failing to replace the Challenged Funds with (a) a better-performing actively managed investment option, or (b) with a cheaper and better performing passively managed investment option, the Bloomberg Defendants failed to discharge their duties with the care, skill, prudence, and diligence that a prudent fiduciary acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

167.    The Bloomberg Defendants' breach of fiduciary duty has substantially impaired the Plan's use, its value, and its investment performance for all Class members.

168.    As a direct and proximate result of the Bloomberg Defendants' breaches of fiduciary duty, the Plan has suffered millions of dollars of damages which continue to accrue and for which the Bloomberg Defendants are jointly and severally liable pursuant to ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a).

169.    Each of the Bloomberg Defendants is liable to make good to the Plan any losses resulting from the aforementioned breaches and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. The Bloomberg Defendants are also subject

to other Plan-wide equitable or remedial relief as appropriate, including an injunction and the removal of fiduciaries.

170.    Each Bloomberg Defendant also participated in the breach of the other Bloomberg Defendants, knowing that such acts were a breach, and enabled the other Bloomberg Defendants to commit a breach by failing to lawfully discharge their own fiduciary duties. Each Bloomberg Defendant knew of the breach by the other Bloomberg Defendants yet failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Bloomberg Defendant is liable for any losses caused by the breach of its co-fiduciary duties under ERISA § 405(a), 29 U.S.C. § 1105(a).

## COUNT II

### Failure to Monitor
### (Against All Bloomberg Defendants)

171.    All allegations set forth in the Complaint are realleged and incorporated herein by reference.

172.    The Bloomberg Defendants had a duty to monitor the performance of each party to whom they delegated any fiduciary responsibilities. A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of Plan assets, and must take prompt and effective action to protect the Plan and participants when they are not.

173.    To the extent any Bloomberg Defendants' fiduciary responsibilities were delegated to another fiduciary, the Bloomberg Defendants' monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently, loyally, and in compliance with governing Plan documents.

174.    The Bloomberg Defendants breached their fiduciary monitoring duties by, among other things:

    a.    failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' actions and omissions in violation of ERISA;

    b.    failing to monitor their appointees' fiduciary process;

    c.    failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating and ensuring that investment options were prudent; and

    d.    failing to remove appointees whose performance was inadequate in that they continued to allow investment options that were imprudent and otherwise violated ERISA to remain in the Plan, to the detriment of Plan participants' retirement savings.

175.    Each fiduciary who delegated its fiduciary responsibilities likewise breached its fiduciary monitoring duty by, among other things:

    a.    failing to monitor their appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' actions and omissions in violation of ERISA;

    b.    failing to monitor their appointees' fiduciary process;

    c.    failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating and ensuring that investment options were prudent; and

    d.    failing to remove appointees whose performance was inadequate in that they continued to allow investment options that were imprudent and otherwise violated

ERISA to remain in the Plan, to the detriment of Plan participants' retirement savings.

176.    As a direct result of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses. Had Bloomberg and the other delegating fiduciaries discharged their fiduciary monitoring duties, the Plan would not have suffered these losses.

## JURY TRIAL DEMANDED

177.    Pursuant to Federal Rule of Civil Procedure 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Bloomberg Co. Retirement Plan, the Bloomberg L.P. 401(k) Plan, and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

i.    find and adjudge that the Bloomberg Defendants have breached their fiduciary duties, as described above;

ii.    find and adjudge that the Bloomberg Defendants are personally liable to make good to the Plan any losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

iii.    order the Bloomberg Defendants to make good to the Plan the losses resulting from each breach of fiduciary duty and to restore to the Plan any profits resulting from each breach of fiduciary duty;

iv.    find and adjudge that the Bloomberg Defendants are liable to the Plan for appropriate Plan-wide equitable relief, including but not limited to restitution and disgorgement;

v.    determine the method by which Plan losses under ERISA § 409(a), 29 U.S.C. § 1109(a), should be calculated;

vi.    order the Bloomberg Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under ERISA § 409(a), 29 U.S.C.§ 1109(a);

vii.    impose surcharge against the Bloomberg Defendants and in favor of the Plan all amounts involved in any transactions or fiduciary breaches that were in violation of ERISA;

viii.    certify the Class, appoint the Plaintiffs as class representatives, appoint Sanford Heisler Sharp McKnight, LLP as Class Counsel, and appoint Russell Kornblith and Charles Field as lead counsel for the Class;

ix.    award to the Plaintiffs and the Class their attorney's fees and costs under ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

x.    order the Bloomberg Defendants to pay interest to the extent allowed by law; and grant such other equitable or remedial relief as the Court deems appropriate.

DATED: January 29, 2026                    Respectfully submitted,

                                           */s/ Russell Kornblith*
                                           RUSSELL KORNBLITH (RK1950)
                                           **SANFORD HEISLER SHARP MCKNIGHT,
                                           LLP**
                                           17 State Street, Suite 3700
                                           New York, NY 10004
                                           Telephone: (646) 402-5650
                                           Facsimile: (646) 402-5651
                                           rkornblith@sanfordheisler.com

                                           CHARLES FIELD (California Bar No. 189817)
                                           (*pro hac vice* forthcoming)
                                           **SANFORD HEISLER SHARP MCKNIGHT,
                                           LLP**
                                           7911 Herschel Avenue, Suite 300
                                           La Jolla, CA, 92037
                                           Telephone: (619) 577-4252
                                           Facsimile: (619) 577-4250
                                           cfield@sanfordheisler.com